UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JUAN HERNANDEZ,

      Plaintiff,

-against-

GLENN S. GOORD, CHARLES GREINER, KATHY GREINER, MORRIS, K. GADSON, ROGERS, CAROL T. CABON, RAY MORGAN, BOB PAGLIUCA, LUCIENT J. LECLAIRE, PERLMAN, GENNY BLAETZ, R. ALEXIS, WILK, J. LAWYER, BUTENHOFF, B.J. SMITH, HAHN, T. KOHLER, J. RHEAUME, D. WILLIAMS, CLERC, C. FRAZER, MARINGOL, WALDRON, OHL, and JOHN & JANE DOES,

      Defendants.

01 Civ. 9585 (SHS)

OPINION & ORDER

---

SIDNEY H. STEIN, U.S. District Judge.

 *Pro se* plaintiff Juan Hernandez has brought this wide-ranging lawsuit pursuant to 42 U.S.C. § 1983 against numerous officers and employees of the New York State prison system. Hernandez alleges that defendants engaged in a massive conspiracy to violate repeatedly his constitutional rights—a conspiracy that allegedly lasted for years and stretched across two prisons where Hernandez has been incarcerated. After extended motion practice and discovery proceedings, the defendants who remain in the action have now moved for summary judgment on some, but not all, of Hernandez's claims. For the reasons set forth below, the Court grants defendants' motion in part and denies it in part. This action will proceed to trial on claims arising out of two incidents: 1) disciplinary write-ups of Hernandez in October 2001 by defendant Robert Smith, and 2) the alleged assault in July 2004 and subsequent threats of Hernandez by defendants Robert Clerc, Colin Fraser, Michael Mrzyglod, and Douglas Williams.

I.  **BACKGROUND**

   A.  **Factual Background**

   *1.  Fires at Sing Sing and Placement in IPC*

Juan Hernandez has been imprisoned in the New York State penal system since 1994. Prior to January 2000, Hernandez was housed at Sing Sing Correctional Facility. Hernandez filed a lawsuit against multiple officers and officials at Sing Sing in 1997 for alleged violations of his Eighth Amendment right to medical care. *See Hernandez v. Keane*, 341 F.3d 137, 141–43 (2d Cir. 2003). In that action, Hernandez alleged, among other things, that Superintendant Charles Greiner failed to supervise properly prison officials and that Kathy Greiner, a nurse at Sing Sing and the wife of Charles Greiner, failed to provide Hernandez medical care. *See id.* at 148–49.

The occurrences that give rise to the lawsuit before this Court began during the pendency of the *Keane* action. On September 3, 1998, a fire broke out in Hernandez's cell, allegedly causing extensive property damage. (Morris Decl. ¶ 3.) Five days later, another fire erupted in Hernandez's cell. (*Id.* ¶ 4; Hernandez Dep. at 94–95.)[1] Defendant Noel Morris investigated this fire and concluded that it was "caused by unknown person or persons." (Morris Decl., Ex. C.)

Following the September 8, 1998 fire, a confidential informant told one "Sgt. M. Cooper" that the fires in Hernandez's cell had been set intentionally. (Third Amended Complaint ("TAC"), Ex. F; Nowve Decl., Ex. B.)[2] As a result, Hernandez was placed into involuntary protective custody for several weeks. (Defs.' 56.1 ¶¶ 9–10, 13–14; Defs.' Reply Mem. at 3 n.1.) Hernandez was released following a hearing where it was determined that at least one of the fires was not intentionally set. (Nowve Decl., Ex. B.)

---

[1]  Excerpts from Hernandez's deposition are attached to the Declaration of Donald Nowve and to plaintiff's opposition to defendants' motion for summary judgment.

[2]  In light of Hernandez's *pro se* status, the Court treats the documents attached to the Third Amended Complaint as part of the record on summary judgment.

### 2. *Transfer to Green Haven*

In January 2000, Hernandez was transferred from Sing Sing to Green Haven Correctional Facility. (Defs.' 56.1 ¶ 15; Collado Decl. ¶ 5.) According to the paperwork supporting the transfer, the move was initiated because Hernandez allegedly had "recognized a security staff [at Sing Sing] with whom he had a previous relationship. Has asked for favors, has knowledge of staff's family details & desires to rekindle relationship. Transfer requested to any suitable facility to alleviate untenable situation." (Collado Decl., Ex. A.) Superintendant Greiner was also transferred to Green Haven a few months after Hernandez's transfer. (Greiner Decl. ¶ 3.) According to Greiner, he was told he would be transferred to Green Haven in about February 2000 and he became Green Haven's superintendant on May 4, 2000. (*Id.*)

Hernandez claims that his travails increased once Greiner arrived at Green Haven. Hernandez asserts that his cell was searched twice in May 2000 as "a message to plaintiff concerning the upcoming [*Keane*] trial." (TAC ¶ 28; Hernandez Dep. at 158.)[3] That trial took place in October 2000, and Hernandez was transferred to federal custody so that he could participate. *See Hernandez v. Keane*, No. 97 Civ. 1267, 2000 WL 34239139, at *3 (S.D.N.Y. Nov. 28, 2000), *aff'd*, 341 F.3d 137 (2d Cir. 2003). The *Keane* trial ended in a jury verdict for Hernandez, but the trial judge overturned it pursuant to Rule 50 of the Federal Rules of Civil Procedure. *See id.* at *3, 9. The U.S. Court of Appeals for the Second Circuit affirmed this decision. *See Hernandez*, 341 F.3d at 149.

### 3. *Return to Green Haven Following the* **Keane** *Trial*

Hernandez remained in federal custody after the *Keane* trial for medical treatment and did not return to Green Haven until February 2001. (Defs.' 56.1 ¶ 18; Hernandez Dep. at 91.) When he did, he allegedly found a hangman's noose waiting on his bed. (Defs.' 56.1 ¶ 18; Hernandez Dep. at 204–07.) Hernandez claims he filed a grievance about the noose—a

---

[3] Defendants repeatedly rely on Hernandez's statements in the Third Amended Complaint as the equivalent of an affirmation or verified complaint.

3

grievance that "all of a sudden turned up missing." (Hernandez Dep. at 206.)

Hernandez had another unpleasant shock on his return to Green Haven. Prison officials had previously determined that Hernandez should be placed in a bottom bunk due to his medical conditions. (TAC, Ex. B at 41.) However, when Hernandez returned to Green Haven, Virginia Blaetz, the official in charge of assigning bunks, placed him in the top bunk in a cell with two inmates. (Defs.' 56.1 ¶ 20; Hernandez Dep. at 325–29.) After Hernandez complained, prison officials admitted that this placement was "an error," but he nonetheless stayed in the top bunk for some time. (TAC, Ex. B at 28–29.) Hernandez claims that his placement in a top bunk caused him pain in his left hand and wrist. (TAC ¶ 41; Pl.'s Mem. in Opp'n, Ex. H at 9.) As a result, Hernandez was prescribed MS Contin, to which he claims he has become addicted. (TAC ¶ 41; Pl.'s Mem. in Opp'n at 48.)

### 4. October 2001 Disciplinary Write-Ups and Tier II Disciplinary Hearing

In the months following Hernandez's return to Green Haven, he became upset at the supposed refusal of his prison counselor, defendant Robert Smith, to see him. Then, on October 1, 2001, Hernandez was allegedly told by unnamed corrections officials to report to Smith's office. (Tier II Disciplinary Hearing Transcript, annexed to the Nowve Decl. as Ex. F, at TR68.) Hernandez purportedly received a pass that authorized him to travel to Smith's office and back. (*Id.* at TR66–69.) At the entrance to the counselors' area, Hernandez informed an officer that he had been told to report to Smith. (Nowve Decl., Ex. E.) That officer passed on this information to Smith, who replied that he had not issued a call-out summoning Hernandez, and that Hernandez "was simply trying to get to see [Smith] on his own terms." (*Id.*)

Hernandez wrote a letter to a prison higher-up complaining of Smith's refusal to see him and asking to be transferred to a new counselor. (TAC, Ex. C at 1–2.) Three days later, on October 4, Smith formally summoned Hernandez to his office. (Nowve Decl., Ex. E.) Smith himself described during the subsequent Tier II disciplinary hearing what happened next.

Smith, in his own words, "told him [Hernandez] not to play me [Smith] anymore about him – to, uh, the bullpen when not being on a call-out, and then trying to gain sides." (Disc. Hearing Tr. at TR62.)  Smith also presented Hernandez with supposed evidence showing that Smith was not neglecting him.  (Nowve Decl., Ex. E.)

At that point, as Smith later put it, "one thing led to the next" and the two got into a heated argument.  (Disc. Hearing Tr. at TR62–63.)  A counselor who witnessed this argument later stated that "they were having [] quite a disagreement. . . . [T]hey were pretty close towards each other, about—let's say less than—definitely less than a foot from each other's face. . . . And they were both very loud."  (*Id.* at TR52.)  The witness clarified that "it didn't look like you [Hernandez] was going to haul off and hit him [Smith], or he you.  It just looked like a heated argument, much like a baseball manager yelling at an umpire [].  It went both ways."  (*Id.* at TR55.)

Hernandez left Smith's office and Smith filled out two inmate misbehavior reports—one concerning Hernandez's attempted visit to Smith three days earlier, and another concerning Hernandez's alleged harassment and false statements that had just taken place.  (Nowve Decl., Ex. E.)  Smith later explained the delay in writing up the October 1 incident as follows: "I could've written it for [Hernandez being] out of place, and I didn't.  Uh, and then as a result of our discussion in my office, I just decided, okay, since he is lying about the, uh, out of place, I'm going to write a ticket.  So I wrote both of them at the same time that day." (Disc. Hearing Tr. at TR61.)  Smith waited another six days before submitting these reports.  (*Id.*, Nowve Decl., Ex. E.)

Smith's two misbehavior reports triggered a Tier II disciplinary hearing.  *See* 7 NYCRR § 270.3(a)(2).  On October 20, 2001, following a two-day hearing, the hearing officer dismissed all charges based on the documentary record and testimony from Hernandez, Smith, and the counselor who witnessed their argument.  (Nowve Decl., Ex. E; Disc. Hearing Tr. at TR96.)

### 5. *April 2004 Misbehavior Report and Drug Test*

Two and one-half years later, on April 14, 2004, Hernandez was in the Green Haven clinic when a prison officer named Miller was brought in after being assaulted by an inmate. (Defs.' 56.1 ¶ 24; Hernandez Dep. at 296–97.) Defendant Tracy Kohler was escorting Miller into the clinic and claimed to observe Hernandez, along with other inmates, "laughing, pointing and making derogatory remarks" at Miller's condition. (Nowve Decl., Ex. G at 4.) Kohler filed a misbehavior report, charging Hernandez with harassment and "conduct which disturbs the order of the facility." (*Id.*; Hernandez Dep. at 300, 305–06.) She also requested that Hernandez be directed to provide a urine sample for drug testing. (Defs.' 56.1 ¶ 25; Hernandez Dep. at 314.) The justification for this test was provided as "abnormal behavior in clinic bullpen." (Nowve Decl., Ex. H.)

A prison official investigated Kohler's report and asked more than ten inmates whether they "hear[d] Hernandez make these statements." (TAC, Ex. C at 15.) None of the inmates admitted to hearing Hernandez's comments. (*Id.*) Kohler's report was dismissed for procedural reasons on April 20, 2004. (Nowve Decl., Ex. G at 1.) A day later, Hernandez was ordered to give a urine sample. (Nowve Decl., Ex. H.)

### 6. *July 2004 Assault, Denial of Medical Care, and Threats*

Finally, Hernandez alleges that on July 6, 2004, two officers isolated him from other prisoners who were on their way to recreation. (Hernandez Dep. at 411–12.) Defendant Douglas Williams then allegedly physically and sexually assaulted plaintiff while defendants Robert Clerc, Michael Mrzyglod, and Colin Fraser looked on, doing nothing. (*Id.* at 412–32.) Hernandez claims that Clerc and Williams warned him not to file a grievance about the assault. (*Id.* at 436, 442–43.) Defendants contend that this incident was nothing more than a frisk. (Defs.' Mem. in Supp. at 27.)

Williams and Fraser led Hernandez back to his cell after this event, all the while allegedly ignoring his requests for medical assistance. (Hernandez Dep. at 444–46.) Hernandez finally saw a nurse at Green Haven two days later, on July 8, 2004. (Nowve Decl., Ex. I.) Despite Hernandez's claims about the alleged assault, the nurse noted that

6

Hernandez's only complaint was a sore throat.  (*Id.*; Hernandez Dep. at 464.)  Five days later, on July 13, 2004, Hernandez saw a Green Haven doctor, who noted that he did not observe any injuries.  (Nowve Decl., Ex. I .)

Despite the officers' warnings, Hernandez did in fact file a grievance about this alleged assault.  (TAC, Ex. D at 15–16.)   Three of the officers responded by allegedly threatening Hernandez.  More specifically, Hernandez allegedly overhead Mrzyglod tell another officer that Mrzyglod was "going to kill" Hernandez.  (Hernandez Dep. at 482.)  Williams allegedly cornered Hernandez and told him:  "we are going to get you again.  This time nobody is going to help you and it will be worse, and . . . if you sue me, so what?  The state will pay, not me."  (*Id.* at 484.)  Clerc and Williams sometimes gave Hernandez "the sly way" while Hernandez was walking down hallways in Green Haven.  (*Id.* at 473.)  Hernandez also witnessed Clerc "standing in front of [Hernandez] and whispering to [Clerc's] buddies and then they start laughing and pointing at [Hernandez]."  (*Id.* at 477.)  As Hernandez put it, "In prison language, [] that's a threat."  (*Id.* at 476.)  Hernandez testified during his deposition that Fraser had not tried to intimidate him following the alleged assault.  (*Id.* at 475.)

In early October, the Central Office Review Committee denied Hernandez's grievance.  (TAC, Ex. D at 11.)

### B.  Procedural Background

Hernandez commenced this action in October 2001.  Defendants subsequently moved to dismiss the complaint and the Court granted defendants' motion in part and denied it in part.  *See Hernandez v. Goord*, 312 F. Supp. 2d 537 (S.D.N.Y. 2004).  Notably, the Court denied Hernandez's claims arising out of the September 3, 1998 fire as having already been adjudicated in the *Keane* action and concluded that Hernandez had set forth a claim for conspiracy to violate his constitutional rights.  *Id.* at 543–46.  The Court also dismissed claims against Goord for lack of personal involvement.  *Id.* at 547.

7

After further proceedings, Hernandez filed a Third Amended Complaint in February 2005 and many of the named defendants once again moved to dismiss Hernandez's claims. This Court granted the motions to dismiss of defendants Goord, Gadson, Caban, Pagliuca, Rheaume, Waldron, and Ohl, but otherwise denied the motion. (Order dated Nov. 27, 2006, Dkt. No. 109.) Following an extensive discovery process and additional motions, the Court also dismissed defendants Penny Rogers, Pamela Rogers, and Kathy Greiner. (Order dated Oct. 22, 2010, Dkt. No. 148.) The remaining defendants have now moved for summary judgment in their favor.

## II.  LEGAL STANDARDS

Hernandez's sprawling complaint asserts claims for violations of his First and Eighth Amendment rights, as well as a conspiracy to violate his constitutional rights. Hernandez also asserts that supervisors at Green Haven and Sing Sing are liable for these purported violations. Before addressing the merits of his claims, the Court sets forth the standards it will apply in analyzing them.

### A.  Summary Judgment

"Summary judgment may be granted only when the moving party demonstrates that there is no genuine issue as to any material fact and that . . . [he] is entitled to a judgment as a matter of law." *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (quotation marks omitted); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

This Court may not weigh evidence or evaluate credibility when considering a summary judgment motion, *see Velez v. Sanchez*, 693 F.3d 308, 314 (2d Cir. 2012), and must "draw all reasonable inferences in favor of the non-moving party." *Gant ex rel. Gant v. Wallingford Bd. of Educ.*, 195 F.3d 134, 144 (2d Cir. 1999); *see also, e.g., Sussman v. Rabobank Int'l*, 739 F. Supp. 2d 624, 627 (S.D.N.Y. 2010). However, the court will "not permit an issue to go to trial on the basis of mere speculation in favor of the party that bears the burden of proof." *Gant*, 195 F.3d at 144.

8

### B. First Amendment Retaliation

Prisoners have a right to exercise their First Amendment rights without suffering retaliation. *See Dawes v. Walker*, 239 F.3d 489, 491–92 (2d Cir. 2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002). "To prove a First Amendment retaliation claim under Section 1983, a prisoner must show that (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009) (quotation marks omitted).

Certain applications of these elements are well settled. First, the First Amendment protects filing a lawsuit and a prison grievance. *See id.* at 128–29; *Gayle v. Gonyea*, 313 F.3d 677, 682–83 (2d Cir. 2002). Second, whether an action is adverse is an objective inquiry that encompasses "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising constitutional rights." *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004) (quotation marks and alterations omitted). Third, "[a] plaintiff can establish a causal connection that suggests retaliation by showing [among other things] that protected activity was close in time to the adverse action." *Espinal*, 558 F.3d at 129.

"Plaintiff has the initial burden of showing that an improper motive played a substantial part in defendant's action." *Scott v. Coughlin*, 344 F.3d 282, 288 (2d Cir. 2003). Once a prisoner shoulders this burden, a defendant may still escape liability on summary judgment if he shows that he would have taken the adverse action "even in the absence of the protected conduct." *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003) (quotation marks omitted). Finally, the Court notes that the Second Circuit has urged judges to view prisoners' claims of retaliation "with skepticism and particular care" since they "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." *Dawes*, 239 F.3d at 491.

9

### C. Eighth Amendment

"The test of whether use of force in prison constitutes excessive force contrary to the Eighth Amendment is whether the force was used in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Scott*, 344 F.3d at 291. "[W]hen prison officials use force to cause harm maliciously or sadistically, contemporary standards of decency[, the touchstone for Eighth Amendment analysis,] always are violated." *Wright v. Goord*, 554 F.3d 255, 268–69 (2d Cir. 2009) (quotation marks omitted). The judicial inquiry focuses on the force applied, not the injury that may result—although injury may cast light on the state of mind of the prison official applying that force. *See Wilkins v. Gaddy*, 559 U.S. 34, 130 S. Ct. 1175, 1178–79 (2010) (per curiam). At the same time, however, "[t]he Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Id.*, 130 S. Ct. at 1178 (quotation marks omitted). In other words, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Wright*, 554 F.3d at 269 (quotation marks omitted).

"An Eighth Amendment claim arising out of inadequate medical care requires a demonstration of deliberate indifference to a prisoner's serious medical needs." *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (quotation marks and alterations omitted). Determining whether a prisoner's medical needs are "serious" is an objective question; whether a prison official acts with "deliberate indifference" is a subjective standard. *See Salahuddin v. Goord*, 467 F.3d 263, 279–80 (2d Cir. 2006).

### D. Supervisory Liability

Supervisors cannot be held liable for violating a plaintiff's constitutional rights solely on the basis of *respondeat superior*. *See Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). "It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Farid v. Ellen*, 593 F.3d 233, 249 (2d Cir. 2010) (quotation marks omitted). In the past, a

plaintiff could show such personal involvement in one of several ways specified by the Second Circuit:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995). And even after the U.S. Supreme Court's decision in *Iqbal*, these "categories supporting personal liability of supervisors still apply as long as they are consistent with the requirements applicable to the particular constitutional provision alleged to have been violated." *Qasem v. Toro*, 737 F. Supp. 2d 147, 152 (S.D.N.Y. 2010); *see also Iqbal*, 556 U.S. at 676 ("The factors necessary to establish a *Bivens* violation will vary with the constitutional provision at issue.").

### III. DISCUSSION

The Court now turns to each of the incidents that form the basis of Hernandez's constitutional claims.

#### A. Cover-Up of September 8, 1998 Fire

Hernandez alleges that Morris covered up the cause of the September 8, 1998 fire in his cell, which Hernandez claims was set by DOCS staff. (Pl.'s Mem. in Opp'n at 8–9, 28.) Even assuming that Morris's alleged cover-up was independently actionable, this claim fails based on the evidence in the record. Morris filed a report concerning the September 8 fire that concluded it was "suspicious" and "caused by unknown person or persons." (Morris Decl., Ex. C.) There is nothing in the record to support the allegation that Morris or his superiors had any knowledge whatsoever of who set the fire.

### B. Transfer to Individual Protective Custody

Following the September 9, 1998 fire, Hernandez was placed into individual protective custody for several weeks. Hernandez claims that defendants' retaliatory animus motivated this transfer. (Pl.'s Mem. in Opp'n at 25–26.) But not a single named defendant was personally involved in the decision to move Hernandez into individual protective custody. The transfer recommendation was made by a Captain Hawlett after he received a request from one "M. Cooper." (Nowve Decl., Ex. B.) Neither is a defendant in this action.

### C. Transfer from Sing Sing to Green Haven

As noted above, in January 2000, Hernandez was transferred from Sing Sing's honor block to Green Haven Correctional Facility, another maximum security prison. Hernandez alleges that Greiner orchestrated this transfer so that Greiner could continue his campaign of violating Hernandez's rights. (Pl.'s Mem. in Opp'n at 12, 29.) The Court interprets this allegation as advancing a First Amendment retaliation claim against Greiner. Transferring Hernandez to Green Haven would allow Greiner to maintain control over Hernandez and continue his alleged campaign of retaliation for Hernandez's initiation and prosecution of the *Keane* action. Even assuming that Hernandez has carried his initial burden, the Court concludes that this claim must fail for two independently sufficient reasons.

First, the record demonstrates that Hernandez would have been transferred to Green Haven "even in the absence of the protected conduct." *Bennett*, 343 F.3d at 137 (quotation marks omitted). The Unscheduled Transfer Review, which set Hernandez's transfer process into motion, stated that Hernandez had recognized a staff member, whom he previously knew, and had "asked for favors, has knowledge of the staff's family details & and desire to rekindle relationship." (Collado Decl., Ex. A.) Under these circumstances, according to the Unscheduled Transfer Review, remaining in Sing Sing was "untenable." (*Id.*) Even though Hernandez disputes these claims (Pl.'s Mem. in Opp'n at 11), he cannot dispute that prison officials had, at least, probable cause to believe

these claims to be true. *See Gonzalez v. Narcato*, 363 F. Supp. 2d 486, 497–98 (E.D.N.Y. 2005).

Second, Hernandez has not put forward a single fact to show that Greiner had any personal involvement in Hernandez's transfer. Greiner himself has stated under oath that he did not participate in any way in the decision to transfer Hernandez to Green Haven (Greiner Decl. ¶¶ 4–5) and, in any event, Greiner had no authority to order such a transfer. (Defs.' 56.1 ¶ 17.) This lack of personal involvement is fatal to Hernandez's claim against Greiner.

### D. Searches of Hernandez's Cell in May 2000

Hernandez asserts that his cell in Green Haven was searched twice in May 2000 in retaliation for the *Keane* lawsuit. However, as a prisoner, Hernandez "had no constitutional right to be free from cell searches of any kind, including retaliatory cell searches." *Rodriguez v. McClenning*, 399 F. Supp. 2d 228, 239 (S.D.N.Y. 2005); *accord Vogelfang v. Capra*, 889 F. Supp. 2d 489, 509 (S.D.N.Y. 2012). Hernandez's claim cannot survive summary judgment.

### E. Noose Found on Bed

When Hernandez returned to Green Haven from the *Keane* trial, he allegedly found a hangman's noose waiting for him on the pillow of his bunk. (Pl.'s Mem. in Opp'n at 12–13.) Hernandez has not proffered any evidence to suggest that any particular defendant placed the noose on his pillow. He has stated that the person who put the noose there must be someone with a key to get in his cell—that is, a prison official. (Hernandez Dep. at 161.) Hernandez testified in his deposition that he "think[s] that [the noose] came from Kean, from John P. Kean." (*Id.* at 158.) However, John Keane, a former warden of Sing Sing and the principal defendant in the *Keane* action, is not a defendant in this action. Hernandez's failure to tie any specific defendant to this incident compels the dismissal of this claim.

### F. Lost Grievance in March 2001

Hernandez claims that he filed a grievance about finding the hangman's noose on his bed in Green Haven, but that this grievance "all of a sudden turned up missing." (Hernandez Dep. at 206; Pl.'s Mem. in Opp'n at 17–18.) During his deposition, Hernandez assigned the blame for the disappearance of his grievance on defendant Richard Alexis, the official responsible for the maintenance of prisoner grievances. (Hernandez Dep. at 205–06; Defs.' 56.1 ¶ 22.) Hernandez avers that it was Alexis's job, given his position, "to see that these grievances are not stolen or lost or defaced or defouled." (Hernandez Dep. at 206.)

To the extent Hernandez advances a claim for violations of his First Amendment right to petition the government for redress of grievances (Pl.'s Mem. in Opp'n at 24), this claim fails as a matter of law. Hernandez has a First Amendment right to access the courts, but the constitution does not similarly protect his right to access a prison grievance system. *See Hayes v. Cty. of Sullivan*, 853 F. Supp. 2d 400, 434–35 (S.D.N.Y. 2012); *Harris v. Westchester Cty. Dep't of Corr.*, No. 06 Civ. 2011, 2008 WL 953616, at *5 (S.D.N.Y. Apr. 3, 2008); *Johnson v. Barney*, No. 04 Civ. 10204, 2007 WL 900977, at *1 (S.D.N.Y. Mar. 22, 2007).

If these allegations are construed as a First Amendment retaliation claim against Alexis, they again must fail due to Hernandez's failure to present any facts that could support supervisory liability, let alone direct liability by Alexis. There is no evidence in the record that could satisfy any of the *Colon* factors, even assuming that they all apply to this claim. Absent evidence of supervisory liability, this claim against Alexis must be dismissed. *See, e.g., Ziemba v. Armstrong*, 430 F.3d 623, 625–26 (2d Cir. 2005) (per curiam).

### G. Lost Medical Records in March 2001

Hernandez claims that when he was returned to Green Haven, his medical records covering the period October 2000 to March 2001 were lost. However, the record reflects that these records were not lost and were in fact produced to Hernandez during discovery. (Defs.' 56.1 ¶ 19; Pl.'s Mem. in Opp'n, Ex. H-2; Nowve Decl., Ex. C.) Hernandez's claim that

these medical records are not his actual records has no support in the record. (Pl.'s Mem. in Opp'n at 13–14, 46–47.) Hernandez's claims concerning his medical records must be dismissed.

### H. Top-Bunking

When Hernandez returned to Green Haven on March 1, 2001, he was assigned to the top bunk in a so-called double cell. Hernandez claims that defendant Virginia Blaetz placed him there in retaliation for his participation in the *Keane* trial and in violation of his Eighth Amendment rights. (*Id.* at 14–16.)

Concerning Hernandez's retaliation claim, placing Hernandez in a top bunk may satisfy the adverse action element of a First Amendment retaliation claim. *See Bowens v. Pollock*, No. 06-CV-0457, 2010 WL 5589350, at *11 (W.D.N.Y. Oct. 12, 2010), *report and recommendation adopted*, 2011 WL 146836 (W.D.N.Y. Jan. 18, 2011). However, there is no evidence in the record suggesting that Blaetz was actually or constructively aware of the *Keane* trial. If she did not know about Hernandez's protected conduct, she could not have placed Hernandez in a top bunk in retaliation against his conduct.

Hernandez's Eighth Amendment claim arising from these same facts also fails. An Eighth Amendment claim in this context requires Hernandez to show that he had a serious medical condition that was met with deliberate indifference. *See, e.g., Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir. 2009). Even if Hernandez's medical condition were serious, he has not proffered any facts to suggest that the medical care he received was anything more than, at most, negligent. *See Alston v. Bendheim*, 672 F. Supp. 2d 378, 386 (S.D.N.Y. 2009); *Jones v. Goord*, 435 F. Supp. 2d 221, 245 (S.D.N.Y. 2006); *Branch v. Brown*, No. 01 Civ. 8295, 2003 WL 21730709, at *13–14 (S.D.N.Y. July 25, 2003). Hernandez's claims regarding his being placed in the top bunk in his cell do not survive this motion.

### I. Bogus Write-Ups and Tier II Disciplinary Hearing

Next, Hernandez alleges that Robert Smith, Hernandez's prison counselor, violated his constitutional rights by falsely writing misbehavior reports about him. (Pl.'s Mem. in Opp'n at 18–19.) The Court construes

the facts supporting this allegation as setting forth a claim for First Amendment retaliation against Smith. Hernandez's complaint concerning Smith constitutes activity protected by the First Amendment. *See McKethan v. N.Y. State Dep't of Corr. Servs.*, No. 10 Civ. 3826, 2011 WL 4357375, at *6 (S.D.N.Y. Sept. 16, 2011). And there is at least a genuine issue of material fact as to whether Smith's write-ups, which instigated a serious disciplinary proceeding, were false. Further, Hernandez has carried his burden in producing evidence of a causal linkage between his protected activity and Smith's adverse actions. "Not only w[ere] [the] misbehavior report[s] written shortly after the [October 1] grievance, [they] arose [in part] from statements that [Smith] says [Hernandez] made to him during their discussion of [Hernandez's] [October 1] grievance." *Gayle v. Gonyea*, 313 F.3d 677, 683 (2d Cir. 2002).

Defendants argue that even if Hernandez satisfies his initial burden, Smith is still entitled to summary judgment since he had a nonretaliatory reason to discipline Hernandez—the verbal altercation on October 4. (Defs.' Mem. in Supp. at 25.) But the verbal altercation took place, according to Smith, after he accused Hernandez of filing unjustified grievances. In other words, defendants rely on Smith's alleged retaliation to justify his subsequent and more serious retaliation. These arguments do not eliminate all genuine issues of material fact. Hernandez's claim against Smith will go forward.

### J. April 2004 Misbehavior Report and Drug Test

Hernandez argues that he was unconstitutionally retaliated against for mocking an injured officer in April 2004, an allegation that Hernandez denies. (Pl.'s Mem. in Opp'n at 20.) However, Hernandez cannot link either the officer's report or Hernandez's urine test to any protected exercise of his First Amendment rights. The abuse he was alleged to have hurled at Officer Miller was not protected activity. *See Allah-Kasiem v. Sidorowicz*, No. 09 Civ. 9665, 2012 WL 2912930, at *9 (S.D.N.Y. July 17, 2012). Even if Hernandez participated in a grievance process following this incident, this could not be causally linked to Kohler's *earlier* request for urine testing. Without a causal nexus with a protected activity, these claims must be dismissed.

16

### K. July 2004 Assault and Denial of Medical Care

Finally, Hernandez makes a series of allegations concerning an assault in July 2004 and its aftermath. Defendants do not move for summary judgment on the excessive force Eighth Amendment claim that arises out of these allegations. (Defs.' Mem. in Supp. at 27.) They do, however, ask the Court to dismiss this claim to the extent it can be construed as one for First Amendment retaliation. Defendants also have moved for summary judgment on Hernandez's Eighth Amendment denial of medical care claim that arises from the fallout from his alleged assault. For the sake of clarity and completeness, the Court addresses all of Hernandez's claims arising out of these allegations.

The facts presented in the record give rise to several causes of action, as construed by the Court: an Eighth Amendment excessive force claim against Williams; failure to intervene claims against Clerc, Mrzyglod, Fraser; First Amendment retaliation claims against these four defendants; Eighth Amendment denial of medical care claims against these four defendants; and First Amendment retaliation claims for the subsequent comments to Hernandez allegedly made by Clerc. Mrzyglod, and Williams.

As set forth above, defendants do not move for summary judgment on the Eighth Amendment claim as to the alleged assault. Relatedly, the record also contains sufficient facts to support Hernandez's failure to intervene claim. A corrections officer who stands by as a prisoner's Eighth Amendment rights are violated can himself be liable pursuant to section 1983, provided that he permitted an assault to continue with deliberate indifference. *See Morales v. N.Y. State Dep't of Corr.*, 842 F.2d 27, 30 (2d Cir. 1988).

As to the retaliation claims, defendants argue that there is no evidence of any protected activity that can be causally linked with the alleged assault. (Defs.' Mem. in Supp. at 27.) The Court agrees. Hernandez baldly alleges that the alleged assault was a "result" of the April 2004 misbehavior report and grievances Hernandez had filed. (TAC ¶ 69.) But there is no evidence in the record suggesting that any of these officers was aware of the April 2004 incident. Moreover, the three months between

April and July that elapsed between these incidents is too long, under the particular circumstances of this case, for a reasonable jury to infer causation.

However, the Court cannot reach the same conclusion as to the later threats to Hernandez made by Clerc, Mrzyglod, and Williams. These can be causally linked to Hernandez's use of the grievance process following the alleged assault. And whether these defendants' conduct is constitutionally actionable largely depends on the truth behind Hernandez's allegations that he had been assaulted.

Concerning the denial of medical care claims, Hernandez did not name either the nurse or the doctor who attended him as defendants in this action. Apart from the assault itself, he does not allege any conduct by any named defendant that a reasonable juror could construe as deliberate indifference to serious medical needs.

### L. Broad Conspiracy Claims

The various events that form the basis of this action have little to hold them together other than Hernandez's claim that they are all products of a massive conspiracy to violate his constitutional rights. (Pl.'s Mem. in Opp'n at 26–27, 34–37.) In opposition to summary judgment, Hernandez did submit testimony from two witnesses who often heard prison guards muttering about taking action against Hernandez. (*E.g.*, Evans Dep. at 31.) Fellow prisoner Jerry Felton even testified that he overheard guards' conversations about Hernandez "about ten [times] a day" for "[w]eek after week after week." (Felton Dep. at 34.) But a conspiracy cannot exist in the abstract. To be actionable, the conspiracy must result in some violation of Hernandez's constitutional rights. *See Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 119–20 (2d Cir. 1995). The Court has singled out two instances that can proceed to trial—Smith's alleged retaliation by writing disciplinary reports in October 2001 and the alleged July 2004 assault. Neither Hernandez nor his witnesses have offered any evidence that *these violations* were the end product of a conspiracy to violate section 1983.

### M. Charles Greiner's Supervisory Liability

Throughout all of his pleadings in this action, Hernandez has insisted that Superintendant Greiner is the mastermind behind most, if not all, of these violations of Hernandez's rights. The Court permitted Hernandez to proceed to discovery on this claim. But now that the fruits have discovery have been revealed, Hernandez's assertions of Greiner's liability have evaporated. Hernandez has not proffered any evidence that creates a genuine issue of material fact concerning Greiner's alleged supervisory liability. He is dismissed from this action.

### N. Qualified Immunity

Finally, defendants argue that they are entitled to qualified immunity, even if their motion for summary judgment would otherwise fail. Defendants are incorrect. As set forth above, only claims arising from two instances will proceed to a fact finder. Each of these remaining claims involved clearly established rights—namely, the right to be free of malicious violence inflicted by prison guards, and the right to exercise one's First Amendment rights without retaliation. *See Ortiz v. Jordan*, 131 S. Ct. 884, 892–93 (2011). The only issue in dispute is whether defendants in fact did the deeds Hernandez alleges. That question is for the jury, not this Court, to decide.

## IV. CONCLUSION

For the reasons set forth above, defendants' motion for summary judgment is granted in part and denied in part. This case will proceed to a jury, which will hear the following claims:

I.  First Amendment retaliation against Robert Smith arising out of the inmate misbehavior reports Smith wrote in response to the October 1 and October 4, 2001 incidents;

II. As to the alleged July 6, 2004 assault;

   a) Eighth Amendment excessive force against Douglas Williams arising out of the alleged July 6, 2004 assault;

   b) Failure to intervene to stop the alleged July 6, 2004 assault against Robert Clerc, Michael Mrzyglod, and Colin Fraser; and

   c) First Amendment retaliation against Williams, Clerc, and Mrzyglod, arising out of their alleged threats to Hernandez after he filed a grievance based on the alleged July 6, 2004 assault.

All other claims and defendants are dismissed.

As set forth in the Court's Scheduling Order dated May 20, 2013 (Dkt. No. 199):

   a) The parties shall file the information required by Rule 3 of this Court's Individual Practices by July 17, 2013;

   b) A final pretrial conference is set for August 1, 2013, at 4:30 p.m.; and

   c) Trial is set for August 19, 2013, at 9:30 a.m.

Dated: New York, New York
       May 29, 2013

SO ORDERED:

_____
Sidney H. Stein, U.S.D.J.

20